Thank you, Your Honors. I'm with the Federal Defenders of Montana, and I represent Mr. Jeffrey Ziegler on appeal. This case involves the search and seizure of Mr. Ziegler's computer files. In our view, while the district court got the factual findings right, it erred in making its ultimate legal conclusions. The district court correctly found, based on the evidence, that the search of Mr. Ziegler's computer files and the seizure of his hard drive was accomplished through the instigation of law enforcement. Where it erred, however, was in applying the standards in O'Connor v. Ortega and the Simons case out of the Fourth Circuit to determine that Mr. Ziegler did not have a legitimate expectation of privacy in those computer files. In relying upon the Simons case, it failed to appreciate that there were two important facts that distinguish Simons from the facts of Mr. Ziegler's case. The first of those is that the search in Simons was conducted by the employer, and it was conducted by the employer for, at least in part, legitimate work-related reasons. Well, in effect, don't we have the same thing here? The employer indicated its intent to cooperate from the very beginning of this, did it not? No, I don't believe that's true, because you have to take a couple of things, keep a couple of things. Well, wasn't it the employer that gave the hard drive to the FBI? Ultimately, the employer did do that. But this came to the – this was first brought to the attention of the FBI through a third-party citizen that gave this information. The FBI agent then called in the IT administrator and the IT administrator's assistant and interviewed them later on that day. Now, what the district court found, and what we submit the evidence supports, is that the FBI agent then told the IT administrator that he should go in and make a backup of this computer drive. Who owned the computer? Excuse me. Let's assume that the agent did request that. First of all, why should there be an expectation of privacy that's reasonable in an office computer that it's not a private computer, or in your personal office with regard to the computer in it, at least? Well, taking aside file cabinets or drawers that are mentioned in Ortega, why should there be an expectation of privacy? And second, assuming there is an expectation of privacy, why isn't there a consent here to search when the general counsel of the company tenders everything over to the government? I guess starting from the last question, the general counsel of the company did not tender those things to the government until after the hard drives were – I realize that. The copies were made. But why isn't that a consent still? Well, and I think also you need to look at how that consent arose. As I recall from the record, there was a question of whether or not the government would actually subpoena the actual computer and try to get it. And so that consent, if you will, to give the actual computer and the actual hard drive to the government, in essence, was made to obviate the need for an actual subpoena. Now, insofar as the first part of the question, I would rely upon the Ortega case. The Ortega case, Justice O'Connor stated, that simply because other members of other employees or supervisors may have some access to an office, that doesn't defeat the legitimate expectation of privacy. But she mentioned in her opinion, as I recall, that there might be an expectation of privacy in file cabinets or drawers, something of that nature I can understand. But how can there be an expectation of privacy in the office PC that's owned by the company, that's monitored by the company, and that's sitting on your desk in your office? As I recall Justice O'Connor's opinion, she drew a distinction between, for instance, like a suitcase that's sitting out in the open, and you leave that out in the open, and so certainly the exterior of that suitcase is not protected by any legitimate expectation of privacy. But she would have drawn the line in disallowing not only the search of drawers, perhaps, but also searching through the top of someone's desk or something of that nature. Now, I would submit in this day and age as well, that computer files really are essentially no different from files that are kept in a file drawer. Now, why is that when, if the company says we monitor Internet use, or we have a policy against certain kinds of Internet use, and we're going to monitor it, why is that like the inside of your drawer? I can look at a law office. My secretary and certainly my supervisor can go through my files. And that's part of my job description. You could argue certainly I've given consent to do that. But I have not given consent for third parties or police officers to go through those files. Who owns the computer? The computer was owned by the company. Can the company take it away if it wants to? Remove it from the office if it wants to? I suppose it could, yes. Well, if it can remove the computer from the office, why can't it also access the equipment? Well, I'm not arguing that the company can't, couldn't access the equipment. But I think that the key here is that it wasn't the company that did it. It was law enforcement that did it. The company, you know, as the government frankly acknowledges, at least initially had no interest in cooperating with the government. Okay. But if they said to the government we don't want to do it, that's the end of it. If they want to cooperate, why can't they? And I think that they probably could, but they didn't. If the company can at any time look inside all the files in the computer, either remotely or by entering the office and doing it, why doesn't that destroy a reasonable expectation of privacy? For example, the judges on the panel here have office computers. You probably have office computers and misheard. Do any of us have an expectation of privacy with regard to the contents of our office computers as opposed to our, you know, not a laptop, not a home computer, but the ones sitting in our desk in our office? I think that we do to the same extent that I have an expectation of privacy in my office in general. Now, certainly my employer can, pursuant to policy, look through the office computer, but that doesn't defeat my expectation of privacy with respect to third parties looking at the computer. And that's the key here, I think, Judge Gould, is that the government essentially took advantage of the employer's policy to obviate the warrant requirement. The government directed these two individuals to go in and make a backup of this computer file when the government had no right to do that. Now, certainly- Well, you said they directed them. They asked them to, right? They asked them to. Then they could have said yes or no. They chose to say yes. Well, these two individuals came in and spoke to the FBI agent, and I think Mr. Schneider's testimony was that he found it unusual, the request unusual, but he went ahead and agreed to do it. Well, it's their computer. If they want to assist the FBI, why can't they? Well, maybe they could, But the other key here is that it wasn't really the company that consented to this. It was the employer who agreed to use subterfuge to go through and obtain these files. Counsel, don't we have an independent source issue here as well? Didn't the company turn over the firewall backup? In other words, what they had from the firewall monitoring? Or not? I don't believe so. I think the company – what happened is Mr. Schneider and Mr. Sopcich went in, and they were interviewed by the FBI. They described what they saw when they initially looked at the contents of the files that had been intercepted by the firewall. And then the FBI agent asked them to make a backup of the hard drive, and they went in in the middle of the night and did that. And then sometime later – So what you're saying is the only evidence in the record here is the evidence from the hard drive itself as opposed to the firewall, which is in the server? I believe that's correct, although I guess you could – I could qualify that with the descriptions provided by Mr. Sopcich and Mr. Schneider as some evidence. You want to – well, you know – I'll reserve my seven seconds. Seven seconds. All right. Thank you, Counsel. We'll hear from the governor. Ms. Hurd. Thank you, Your Honor. May it please the Court, my name is Marsha Hurd, and I'm an assistant U.S. attorney for the District of Montana, and I handled this case in the court below. And I think the issue here has been very clearly set out. Was there any reasonable expectation of privacy that Ziegler had in the computer owned by Frontline where Frontline found the first evidence of child pornography violations and Internet usage violations for the company and then provided that evidence by consent to the government through the FBI? Okay. Ms. Hurd, this is Judge Gould. So I have a question for you. Okay. Mr. Ness, in his argument, says that the employee has no expectation of privacy vis-a-vis the employer who can look in the computer but does have an expectation that third parties, people other than the employer, won't come into his office and look in his computer and that the employees here being directed by the agents, by the law enforcement agents, or based on the finding that was made, that it's like the government coming into his office. So how do you answer that in terms of your view on the expectation of privacy? Is there an expectation that people other than the employer aren't going to look in your computer? Well, I think it depends on who the other people are. As Mr. Ness noted, we all are under various kinds of regulations where our employers can look at our computers and see what we're doing on our work time and with our work equipment, which is exactly how this case started. And our employers, when they own the computer systems and they direct what it is we can do with our time, certainly have the ability then to contact law enforcement if they find illegal activity occurring. So I think he's correct in the sense that we wouldn't expect the FBI to just come walking into our office and take our computer, but that isn't what happened in this case. What happened in this case was that Frontline was concerned about what Mr. Ziegler was doing with his computer on company time and using company equipment, found that he'd been accessing, receiving, and possessing child pornography. The report was made to law enforcement in kind of a roundabout way. And then we have a situation where computer techie people are visiting with a very non-computer techie FBI agent. The computer people from Frontline are telling the agent that they have made a copy of his cache, basically showing where Ziegler had been going on the Internet and that it contained a large amount of child pornography. He's taking that to mean they've already made the copy of the hard drive that has contraband child pornography on it. They are telling him they are worried that somebody within the company higher up is going to tamper with that, and he says to them, you need to secure that evidence. And so they were talking about apples and oranges, unfortunately, in hindsight. They took that to mean go make a copy of the hard drive. He believed that had already been made, and I think that's pretty clear in the record from the suppression hearing that they weren't talking about the same exact things the copies had been made of. Counsel, on that point, you heard my question about independent source. Did I misunderstand the record with respect to that? No, I don't believe you did at all. My memory is that there was a copy of the tape of his hard drive that was also given to the FBI, and I think that's at Excerpts of Record, page 42, which is grand jury testimony from William Softitch. He said that he was instructed to receive a copy of the tape of his hard drive, and I believe that what they turned over was both a copy of the traffic going in and out of the firewall logs because we had those logs in the criminal case, plus also the hard drives and the backup hard drives that were made for security purposes. Okay. In this case, they had already placed a monitor on the hard drive and were copying all the traffic going in and out. I think that's supported by the record at ER 129 and 130, and the FBI knew at that point that there was a backup already being made. That's also at Excerpts of Record 131, and that a copy of the cache had been made on Excerpts of Record 133. And so basically this information is already contained within the employer's grasp. The employer knows clearly that it is illegal material because they've looked at it themselves, realized it is contraband. But was that material turned over to the FBI? Yes, it was. It was, okay. And then from there, as you can see, there's kind of this interesting dialogue about making extra copies of the hard drives because they're afraid they're going to be tampered with, and in fact somebody had gone in and opened up the cabinet where the one hard drive had been made, and they had to be resecreted into a fire safe so they could be given to the FBI. The corporate counsel, Michael Freeman from Minneapolis, then contacted, it's clear from the record, both the U.S. Attorney's Office and the FBI and said we're willing to completely cooperate. You do not need to get a search warrant. We're happy to turn this evidence over to you, and they did. So I think in this case there is no government taking advantage of anyone. The criminal activity was already located. The employer certainly had the right, given the policies in place, to monitor that Internet activity. They had a whole department whose job it was to do nothing but monitor Internet activity and make certain at least every day to two days what people were doing, that their employees were working and not web surfing. Their firewalls would trap any information and create a log file showing who had violated company policies, and then they would be confronted about that. In this case they also had remote administration. The IT department could access anybody's computer as the administrator to see what they were doing, to make any routine changes or updates that they needed to, and it was clear to the employees at Frontline that they had no reasonable expectation of privacy in their computer system. Are there any other questions from anyone on the panel? No questions from the panel, Ms. Hurd. Okay. Thank you very much. Thank you. You have a little. I'll give you more than seven seconds to say whatever you need to say. Ms. Hurd cites to page 42 of the excerpts of record to indicate that the IT employees had already made a copy of the computer's hard drive, and I think it's important to actually read the testimony there. There's talk about getting a copy of the search engines and a copy of the tape of the hard drive, and then the question is of the employee now, how would you go about doing that? And the employee testified, that required me to physically open his case, pull the hard drive out, find another hard drive of the exact dimensions, and do something called a sector copy. I think what all that makes clear is that that hard drive and the copies were actually taken at the behest of law enforcement. They were not made prior to that. The other thing that I think is very important here is that the initial report of this crime came through a third person who was informed by his fiancee who worked for the company that someone had been accessing child pornography. This third party who didn't work for the company called the FBI agent, and that was how the entire investigation got started. Frontline was antagonistic, if anything, towards the FBI investigation, and the government frankly acknowledges that in its brief. It states that Frontline's management took offense to Schneider's cooperation with the FBI, and it makes that notation on page 6. So the company not only did not... The company changed its policy after that, did it not? It agreed to cooperate later, did it not? It agreed to cooperate later after these copies had already been returned over to the FBI, and after, if you will, maybe it's the wrong word, but threat of a subpoena. Thank you, counsel. The case just argued will be submitted for decision, and we will now hear argument with both counsel present in courtroom in Floyd v. Barnhart.
judges: O'scannlain, Silverman, Gould